236 S.W.2d 375 (1951)
HAWKINS
v.
LAUGHLIN et al.
No. 21515.
Kansas City Court of Appeals. Missouri.
January 8, 1951.
*376 Philip J. Fowler, Kirksville, Allen Rolston, Lancaster, for appellant.
Jayne & Jayne, Kirksville, for respondents.
CAVE, Judge.
This is an action to recover damages alleged to have been sustained by the plaintiff resulting from burns inflicted upon her while she was a patient at defendants' hospital.
At the conclusion of plaintiff's evidence defendants filed a motion for a directed verdict because of the insufficiency of the evidence to make a submissible case. Code Sec. 112, R.S.1949, § 510.280. This motion was overruled and defendants declined to offer any evidence and the cause was submitted to a jury, resulting in a verdict for plaintiff in the sum of $1500. Thereafter, defendants filed a motion in the alternative, asking, first, that the court, notwithstanding the verdict, set aside the verdict and enter a judgment for defendants; and, second, that defendants be granted a new trial. Code Sec. 113, R.S.1949, § 510.290. The court sustained the motion to set aside the verdict, and thereupon sustained defendants' motion for judgment filed at the close of plaintiff's evidence and entered judgment against the plaintiff, from which she has appealed. See Johnson v. Kansas City Public Service Co., Mo.Sup., 214 S.W.2d 5.
Plaintiff's petition alleged that she was a patient at defendants' hospital, and while she was so confined in said hospital " * * * said defendants and their servants, doctors and nurses while acting within their scope of authority, negligently and carelessly placed the right foot and ankle and leg of plaintiff on a bottle or container filled with very hot water or other hot substances unknown to this plaintiff, and so placed such container so filled upon and against such leg, ankle, and foot, and kept the leg, foot, and ankle of this plaintiff in contact with such container so filled with such hot substances for many hours, and at the same time negligently and carelessly placed covers upon this plaintiff, so placed as to retain such excessive heat in contact with the leg, foot, and ankle of plaintiff as aforesaid and kept the same there for many hours all while plaintiff was so unconscious, and all so as to cause such container so filled with such hot substance to burn, sear, cook and impair and destroy the skin, flesh, *377 muscles, blood vessels, tendons and all other parts of such leg, foot and ankle. * * * "
The sole question presented here is whether plaintiff's evidence made a submissible case of negligence for which the defendants are liable. The principal contentions of the defendants are that plaintiff's evidence failed to prove that the person who placed the hot water bottle at plaintiff's feet was an agent or an employee of the defendants; and that there is no evidence that plaintiff's injury was caused by any negligence. This will necessitate a detailed statement of the testimony concerning such issues.
It is conceded that the defendants are a co-partnership doing business under the firm name of The Laughlin Hospital and Clinic; that they own and operate a general hospital in Kirksville where they receive and treat patients; that the plaintiff was a patient of Dr. Earl Laughlin, one of the partners, and was received into the hospital on November 10, 1948; that he performed a gall bladder operation for her on November 11. The operation was successful and no complaint is made because of that service.
This action was tried and submitted on the theory that sometime during the night of November 11 a nurse put a hot water bottle at the feet of plaintiff and left it for several hours, resulting in a burn to her right foot and ankle. The evidence is overwhelming that plaintiff received a severe burn to her foot and ankle. The question is, does the evidence fix liability therefor on the defendants? In deciding this question, we must follow the well-settled rule in this state that plaintiff's evidence, and all reasonable favorable inferences that may be legally drawn therefrom, must be viewed in the light most favorable to her.
Both the plaintiff and her husband testified that they did not employ a special nurse or any particular nurse to attend the plaintiff while she was in the hospital, and that they did not authorize anyone else to do so.
Mrs. Hawkins testified that she did not regain complete consciousness from the operation until early the next morning, at which time her foot "was burning."
Mr. Hawkins testified that he brought his wife to defendants' hospital on the morning of November 10; that she was operated on by defendant, Dr. Earl Laughlin, on the morning of the 11th, and that he remained with her all that day until sometime in the evening "after supper"; that he returned to the hospital the next morning shortly before 7 o'clock and found that his wife was not rational, "she could not talk at all"; the first thing she said was "my foot," or "my feet," and he asked the nurse to "look at her feet"; that the nurse did look, and "I seen her take something out of the bed. It looked like a hot water bottle."
"Q. And was that at her feet? A. That was at her feet and that foot was as red as fire." He stated that the nurse applied Unguentine to his wife's foot and bandaged it. His wife was placed in a ward of the hospital immediately after the operation where there were three or four other patients and there were nurses coming in and out of the ward during the time he was there. When it appeared that his wife was not doing as well as he thought she should, "I told them I wanted to be there until somebody come there to take care of her and somebody there said there would be somebody there to take care of her. Said if she was that sick they had good nurses and they would take care of her, * * *.
"Q. Now, you saw this hot water bottle removed on the morning of the 12th? A. That's right.
"Q. And the foot at that time was red and inflamed? A. Red as fire. * * *
"Q. And when you came back the next morning (12th), you say just before seven o'clockthere was a special nurse in attendance on your wife when you got there? A. I don't know whether she was a special or not.
"Q. Well, it was Mrs. Rowe (Roe), wasn't it? * * * A. Yes, I heard that was what her name was, later on.
"Q. She went off that work at seven o'clock? * * * A. Yes.
*378 "Q. And you were in the room from that time on, from the time you got there until Mrs. Lott came? * * * A. She was ready to go to work right then when I got there.
"Q. She is the one that you saw remove the hot water bottle from the bed? A. That's right.
"Q. Now, after Mrs. Lott went off duty, what time did she go off duty? A. Three o'clock.
"Q. Who came on duty then? A. McClaid."
He also testified that he paid the expenses incident to the hospitalization of his wife and that he paid the various nurses for their services by checks separate from those given to the hospital for the operation. On cross-examination he was asked:
"Q. You didn't have any information about the employment of special nurses by your wife or for your wife until after she had been there several days? A. Nobody ever said a word to me about any special nurses, no, sir.
"Q. The means by which they were employed or at whose direction or instance, you have got no information about that? A. That's right. I did not.
"Q. You just did know that she did have special nurses? A. I didn't even know there was special nurses for several days. * * *
"Q. Now, on the morning of the 12th of November when you came to the hospital who did you see in the ward where your wife was? A. Well, I think it was the Supervisor and Rosemary Lott and they said it was Mrs. Roe. * * *
"Q. And at seven o'clock did they change nurses? A. Yes, one was going off and one coming on.
"Q. And at seven o'clock Rosemary Lott came on duty? A. Yes, sir. * * *
"Q. Now, when did you first find out that there were special nurses working there? A. Oh, it was seven or eight days I think.
"Q. How did you learn that? A. Through Doctor Earl Laughlin. * * *
I asked him how long it would be that he was going to keep the nurses onit was getting about time that she should have went homeand he saidwell, he says, `we will see. Possibly three or four days we will keep them.' I said, `Well, now, I will just leave this purely up to you. * * * Whenever you think you are done with them, all right. Until you say that, you can keep them on.'
"Q. Did you know any of these nurses? A. I did not.
"Q. You never had met them before until you found them there on the job working? A. Never had.
"Q. And Doctor Earl advised you that he would keep them there? A. That is right. * * *
"Q. And did they keep those nurses there? A. * * * until she went home, yes.
"Q. Who presented you these bills for the nursing? A. Lorraine McClaid.
"Q. She gave you all the bills? A. Yes, sir.
"Q. You wrote out the checks? A. She wrote the checks and I signed them. * * *
"Q. Now, nothing had been said to you by anyone there about any special nurses until you say you surmised they were? A. No, sir.
"Q. And then you talked to Dr. Earl? A. That's right.
"Q. Were there other nurses on duty around there too? A. Plenty of them."
Defendant, Dr. Earl Laughlin, testified as follows:
"Q. How many doctors are on the staff of that hospital? A. We have our four partners and I think four others besides our interns. * * *
"Q. How many interns at the present time? A. We have two.
"Q. About how many nurses do you employ? A. Oh, somewhere around fifty. That varies a little bit. * * *
"Q. Did you say anything to Mrs. Hawkins or to her husband about any special nurses? A. I don't remember that I did.
*379 "Q. Doctor, what is a special nurse? A. A special nurse is a nurse who is employed to give constant attention to a patient. In differential, our floor nurses give attention to all the patients. In other words, all patients do not need attention constantly and our floor nurses are employed by the hospital and give the usual routine nursing care.
"Q. And a special nurse just gives special care? A. Takes care of just one patient, yes.
"Q. Now, you saw and dressed Mrs. Hawkins' foot? A. I did. * * *
"Q. What was the condition of that foot, Doctor ? * * * When you first saw it? A. There was a blister on the ankle, on the foot and ankle. * * *
"Q. That appeared to be a burn? A. It appeared to be a burn. * * *
"Q. How long did you treat that ankle, Doctor, about ? A. From the time she was dismissed from the hospital on November 28th until May 1st, I saw her nine times. * * *
"Q. When * * * did you discover that complication of her ankle ? A. I think it was on the 12th. * * *
"Q. Now, you say there are four of you interested in the operation of the hospital as partners ? A. Yes, sir.
"Q. You have a business manager? A. We do.
"Q. Do you have supervisors who are authorized to take care of routine matters? A. We do.
"Q. Do you know who made the arrangement or talked with the patient or her husband or others about the selection or employment of special nurses? A. No, I do not. * * *
"Q. Well, did you know the nurses who were in charge of the plaintiff while she was in your hospital, from the time of her operation until the 12th of November? A. Yes, sir.
"Q. Who were those nurses? A. * * * Rosemary Lott, McClaid* * * and Roe. * * * And then there is Minear, another one that is on here. * * * Upon the 12th, Rosemary Lott came on duty at seven o'clock and she was relieved by McClaid at three.
"Q. * * * Now, before that on the 12th who was on duty up until seven o'clock? * * * A. Well, on the night of the 11th at eleven o'clock E. Roe came on duty and was relieved by Lott at seven o'clock on the morning of the 12th.
"Q. Now, was E. Roe in the employ of the Laughlin Hospital at that time? A. Not as a special nurse.
"Q. Was she on the pay roll? A. Not on that shift. If she was on another shift, I don't know. The Business Manager would know about that.
"Q. Well, during those hours? A. During those hours she was not an employee of the hospital. * * *
"Q. Now, who is E. Roe? A. It is the girl back there (pointing to rear of courtroom).
"Q. She is a nurse?A. Yes, sir.
"Q. That works in the hospital? A. She has. * * *
"Q. Doctor, in whose employ was she, if she was not in yours? A. She was not in ours, because we did not pay her.
"Q. Who got her over there? A. I don't know.
"Q. You mean you just let her come in and treat your patients without knowing anything about it? A. No, sir, she was called, possibly, by one of the supervisors.
"Q. She was called by one of your employees there at the hospital? A. Yes, sir.
"Q. And came to the hospital and worked there? A. That's right.
"Q. And Mrs. Hawkins at that time was in your hospital under your general supervision and care ? A. That's correct. * *
"Q. Doctor, do your records show a hot water bottle placed to her feet? A. Well, there is a record of a hot water bottle being put to her feet on the night of the 10th.
"Q. That was before the operation? A. Here is a notation that at 10:40 she is apparently sleeping; at 11:10 she says she is uncovered, but she was fully covered; at 11:30 she seemed to be restless and complained about being uncovered and they *380 put blankets around her; a hot water bottle was put to her feet. * * *
"Q. What hour was that hot water bottle put to her feet? A. That was 11:45 on the 10th, the evening of the 10th; and then on the 12th, in the morning, after surgery, after she was in shock, hot water bottles were applied to the feet.
"Q. What time was that? A. That was at two-thirty, in the morning.
"Q. Does the record show who was on duty at the time the hot water bottle was placed to her feet? Does it show who was in charge of her? A. At eleven o'clock E. Roe was on duty.
"Q. That is the E. Roe that you testified about a while ago? A. Yes, sir.
"Q. She was on duty up until seven the next morning? A. Until she was relieved by Lott at seven o'clock the following morning."
It is unnecessary to mention the evidence concerning the nature and extent of the injury as no point is made of that branch of the case.
Was the evidence sufficient to make a submissible issue whether nurse E. Roe was acting for and on behalf of the defendants? There is no particular mode by which an agency may be established. It is immaterial what terms are used by the parties, or by what name the transaction is designated, if the facts, taken as a whole, fairly disclose that the one party is acting for or representing another by the latter's authority. The relationship of agency does not depend in every instance upon an express appointment and acceptance, but is often to be implied from the words and conduct of the parties to the transaction. Kaden v. Moon Motor Car Co., Mo.App., 26 S.W.2d 812; Noren v. American School of Osteopathy, 223 Mo. App. 278, 2 S.W.2d 215, 220. It is also true that agency need not be shown by direct evidence, but it may be presumed or inferred from all the facts and circumstances. State ex rel. Baumann v. Doder, Mo.App., 121 S.W.2d 263, 265. Applying these general principles to the facts in the instant case, we think it is but a natural and reasonable inference and conclusion that nurse Roe was called by the defendants to attend plaintiff and that they are liable for her negligence, if any.
Dr. Laughlin testified that the hospital employed "somewhere around fifty" nurses; that nurse Roe had worked at the hospital, and in referring to her being present in the hospital and waiting upon Mrs. Hawkins he stated that, no doubt, she was called by one of defendants' employees. He positively identified her as being the nurse on duty at the time plaintiff was burned. It is true that he testified she was not employed by the hospital in this particular instance, "because we did not pay her." But the mere fact that plaintiff's husband paid the nurses by checks separate from that given to pay for the operation would not, in our opinion, destroy the reasonable inference, when all the other facts are considered, that nurse Roe was procured by the hospital authorities and was acting for and on their behalf. Plaintiff and her husband testified that they did not employ her or authorize anyone else to do so.
Defendants lay great stress on the fact that Mrs. Roe is referred to as a special nurse, and argue that this conclusively proves she was employed by the plaintiff or her husband, or at their request, and therefore became their employee. Dr. Laughlin defined a special nurse as one who is "employed to give constant attention to a patient." But it does not follow, as a matter of law, that the patient does the employing or is responsible for the acts of such employee. Under the facts in this case, it was the duty of defendants to see that plaintiff was given such attention as her condition reasonably demanded, which would include proper nursing. Reed v. Laughlin, 332 Mo. 424, 58 S.W.2d 440, 442.
Defendants cite and rely on Louzader v. James, Mo.App., 107 S.W.2d 976. The facts in that case are quite different from the facts in the instant case. In that case plaintiff was a patient in a private hospital, not owned or operated by the defendant doctor; none of the doctors who practiced there had any financial interest in it; and according to the custom and practice in *381 that hospital, a list of graduate nurses was kept and the nurses called in their order off that list for duty as special nurses. After reviewing all of the evidence, the court said 107 S.W.2d 980: "The only reasonable inference, as we view it, that can be drawn from the testimony, is that she (nurse) was employed by the appellant (plaintiff)." That is not the situation in the instant case. We think the converse is true.
The next question for consideration is whether the evidence justifies the inference that a hot water bottle was placed on plaintiff's feet. There can be no doubt about that. Dr. Laughlin testified that "after she was in shock, hot water bottles were applied to the feet." This was done about 2:30 a. m., and Mr. Hawkins testified that he saw the bottle removed about seven a. m. Dr. Laughlin also testified that nurse Roe was on duty and in charge of plaintiff during that time. Certainly this would justify the inference that she applied the hot water bottle; common knowledge teaches us that strangers are not permitted to go about a hospital at 2:30 a. m. waiting upon patients.
But defendants argue that the evidence does not show that after the hot water bottle was placed at plaintiff's feet the defendants, or someone for them, carelessly placed covers on plaintiff so as to retain the excessive heat in contact with her feet, as alleged in the petition. Even if this be an essential element of plaintiff's case, we have the testimony of Dr. Laughlin that the very purpose of applying heat to a patient in surgical shock "is to preserve the body temperature, * * * particularly with reference to the extremities." A competent nurse would know the purpose of applying heat to a patient in shock. Furthermore, Dr. Laughlin testified that the day before this incident the plaintiff had complained of being cold, and that she was immediately wrapped in blankets and hot water bottles applied. Plaintiff's husband testified that when he arrived at the hospital about seven a. m., on the morning of the 12th, his wife complained of her feet and he asked the nurse on duty to make an examination, which was done, and the hot water bottle was removed. If her feet had been uncovered there would have been no necessity for such an examination; the condition would have been obvious. There is no merit in this contention.
However, defendants assert that if all other elements of plaintiff's cause of action is proved, nevertheless her case must fail because there is no evidence "that her injury was the result of any negligence." This argument is founded on the theory that the application of heat to the feet was the proper, standard and recognized treatment in such cases, and that the evidence fails to prove that the container was so hot that a reasonably prudent person should know that it would likely produce harm to plaintiff if so used. The evidence is overwhelming that plaintiff's foot was burned by the hot water bottle over an area about "four inches wide and six inches long"; that immediately upon the removal of the hot water bottle on the morning of the 12th her husband noticed that her foot was as "red as fire." Dr. Laughlin testified that when he first examined plaintiff's foot on the morning of the 12th "there was a blister on the ankle, on the foot and ankle. * * * Eventually the upper layer of the blister came away and there was an area of a burn on the ankle which required frequent dressing for sometime." Under this, and other evidence referred to, we would be unwilling to say, as a matter of law, that there is no substantial evidence to support the proposition that a reasonably prudent person, and especially a trained nurse, should not know that the contents of a hot water bottle would likely burn plaintiff's foot under her then condition. The foot was burned, and it can be inferred that this would not have resulted if the contents of the hot water bottle had been of proper temperature. No one would be in a better position to know this than the nurse who made the application.
It is our opinion that, when all the evidence is considered, plaintiff made a submissible case, and that the court erred in sustaining defendants' motion and entering judgment for defendants.
*382 It follows that such judgment should be reversed and the cause remanded with directions to reinstate the verdict of the jury and enter judgment thereon, with interest from the date of the verdict. It is so ordered.
All concur.