**LARNER–DIENER REALTY CO. et al.**

v.

**FREDMAN et al.**

No. 43856.

Supreme Court of Missouri.

Division No. 1.

March 8, 1954.

Motions for Rehearing or to Modify Opinion Denied April 12, 1954.

Albert E. Hausman, Dubinsky & Duggan, Carl M. Dubinsky, St. Louis, James T. Blair, Jr., Jefferson City, for appellants.

Lon Hocker, Jr., St. Louis, for respondents. Jones, Hocker, Gladney & Grand, Lowenhaupt, Waite, Chasnoff & Stolar, St. Louis, of counsel.

VAN OSDOL, Commissioner.

Action for specific performance of a contract to sell real and personal property, a hotel ("Hotel Steven") and personal property used in the operation thereof at Granite City, Illinois. Defendants, vendors in the contract, filed answer, and a counterclaim for $16,175 actual and $60,000 punitive damages, alleging that plaintiffs were defendants' agents and entered into the contract by their straw party, one Mamie Alton, and failed to disclose that they, plaintiffs, were the real purchasers. The trial court entered a decree of specific performance, ordered defendants to account for rents and profits, and dismissed their counterclaim. Defendants have appealed.

(Mamie Alton also instituted an action against defendants for the specific performance of the contract of sale, and for an accounting. It was stipulated that the Alton case was to be tried and considered in conjunction with the instant case. Upon the entry of an interlocutory decree and order for an accounting in favor of plaintiffs in the instant case, the petition in the Alton case was ordered dismissed effective upon the entry of final judgment in the instant case. Plaintiff Alton did not appeal.)

At the outset we must make disposition of respondents' motion to dismiss the appeal which is based upon asserted failures to comply with 42 V.A.M.S. Supreme Court rule 1.08. We have examined and considered respondents' argument and authorities cited in support of the motion, and appellants' suggestions in opposition thereto. We believe the asserted faults of appellants' brief are not such as would justify the dismissal of the instant appeal. The motion is overruled.

Herein upon appeal defendants-appellants contend the trial chancellor erred in finding in favor of plaintiffs. Defendants-appellants urge that the evidence shows plaintiffs were defendants' agents and the contract of sale was entered into with one Mamie Alton, who was plaintiffs' nominee or straw party, as purchaser; and, by means of their nominee, plaintiffs, defendants' agents, were the secret but actual purchasers and through devious transactions were to make a secret profit upon the consummation of the sale contemplated by the contract between defendants and Alton. Plaintiffs-respondents, on the other hand, contend they were not defendants' agents and had not undertaken to act as defendants' agents in the transaction. They say they, as principals through their straw party, entered into the contract with defendants to purchase the property for themselves; that defendants knew Alton was plaintiffs' straw party; and that defendants were only interested in receiving a "net" of $80,000 for their property and had advised plaintiffs that they, defendants, were not concerned with "what profit" plaintiffs could make in the transaction.

The creation of the relation of principal and agent rests in the intention of the parties which may be express or implied, and need not be a conscious intention, but may be determined from the facts and circumstances of the particular case. 2 C.J.S., Agency, § 17, pages 1041–1042. "The rule is universal that an agent authorized to sell property for another cannot himself be the purchaser, unless he discloses fully to his principle that he is the purchaser, revealing everything within his knowledge relating to the transaction." Benson v. Watkins, 313 Mo. 426, 285 S.W.

407, 408. See also Utlaut v. Glick Real Estate Co., Mo.Sup., 246 S.W.2d 760, and authorities therein cited; Curotto v. Hammack, 362 Mo. 457, 241 S.W.2d 897, 26 A.L. R.2d 1302; Jewell Realty Co. v. Dierks, 322 Mo. 1064, 18 S.W.2d 1043.

■ In this case, an action in equity, it is our duty to try the case anew, to weigh the evidence and to reach our own conclusions. The evidence introduced in the trial of the cause is complicated and involved. Consequently, it is necessary to make an extensive statement of the facts and to carefully examine the testimony, particularly the testimony touching upon the issue of plaintiffs' agential relationship, this issue being the crucial and decisive one in our opinion.

There was evidence introduced tending to show that plaintiff Larner-Diener Realty Company, a corporation, sometimes hereinafter referred to as "Larner-Diener," conducts a real estate business in St. Louis; Louis Diener is president, and Martin Larner is secretary-treasurer. Plaintiff Nat Gordon is a real estate-broker who has been associated with plaintiff Larner-Diener for seven or eight years. Mamie Alton has (admittedly) acted as plaintiffs' nominee in many real estate transactions. She has no substantial financial standing, and has permitted plaintiffs to use her name as their straw party for comparatively small fees. She is a distant relative of Martin Larner. In the contract involved herein, Mamie Alton's name appears as the purchaser. In executing the contract, her name was signed by plaintiff Nat Gordon.

In making a futher examination of the evidence, it would seem useful to now state the effect of the contract involved in the instant action, and the effect of other contracts which were entered into by plaintiffs through their nominee, Alton, in anticipation of the consummation of the contract involved in the instant action.

August 3, 1948, Mamie Alton, acting as plaintiffs' straw party, entered into a contract of exchange with Irving and Ruth Hartmann whereby Alton agreed to convey to the Hartmanns the Hotel Steven in Granite City and the personalty used in the operation of the hotel, all subject to a lease, and subject to a (first) lien of a deed of trust securing the payment of $30,000 and to a (second) lien of a deed of trust securing the payment of $20,000. As consideration for the conveyance and transfer of the hotel property as stipulated, the Hartmanns were to execute a (third) deed of trust securing the payment of $15,500 to Alton; and the Hartmanns were to convey to Alton a tract of real estate known as the "Olive Street" property, subject to liens aggregating $16,125, and a tract of real estate known as the "Washington Avenue" property, subject to a lien of $6,000. The contract was signed by the Hartmanns, and by Mamie Alton "as owner under contract." The contract stipulated December 1, 1948, as the date the transaction should be consummated. Actually it was not until August 13, 1948, that defendants Sam and Jessie Fredman entered into the written contract (involved in this action) whereby they undertook to sell the Hotel Steven to Mamie Alton for $80,000, represented by $5,000 earnest money and $25,000 to be paid on the closing date, December 1, 1948, the purchaser Alton assuming and agreeing to pay the obligations aggregating $50,000 secured by the then existing first and second liens (mentioned supra) on the hotel property.

Theretofore, as early as July 26, 1948, the Hartmanns by contract of sale had recognized the exercise of an option of their lessee, one Walter, to purchase the Washington Avenue property. The contract between the Hartmanns and Walter was approved by Mamie Alton, as "owner under contract." On November 10, 1948, a contract was entered into whereby "Mamie Alton owner under contract" undertook to sell the Olive Street property to the Karen Realty Company.

According to the testimony of Martin Larner, secretary-treasurer of plaintiff Larner-Diener as stated, the value of the "equities" in the Washington Avenue and Olive Street properties was approximately $31,000.

Thus it may be observed that plaintiffs' straw party by her contract of August 13, 1948, the contract involved in the instant action, agreed to pay defendants $80,000 (by $30,000 in cash and by the assumption of $50,000 in encumbrances) for the Granite City hotel. She was to receive (for the hotel) from the Hartmanns, by her exchange contract of August 3d, the approximate equivalent of $96,500 (the "equities" of the Washington Avenue and Olive Street properties, approximately $31,000 in value, the Hartmanns' assumption of the $50,000 encumbrances on the hotel and the stipulated execution of a (third) lien on the hotel securing $15,500). It is also observed that whatever profit might have been made by plaintiffs in these transactions (upon a consummation of the contract involved in this action) through their straw party, Alton, was in substantial part a "paper" profit, that is, the gain to plaintiffs of approximately $16,500 was substantially represented by the note of the Hartmanns to Alton for $15,500 secured by the third lien on the Granite City hotel property.

Turning now to the evidence relevant to the issue of agency—

Martin Larner and defendant Sam Fredman had been "country club" friends for some years, and, on or about June 1, 1948, an initial conversation was had at the country club between Larner and Fredman, and a later conversation took place at a drugstore in Granite City, relating to defendants' Granite City hotel property. Inasmuch as these conversations have an important bearing upon the question of the "agency" of plaintiffs, we here set out in question and answer form a part of the testimony of defendant Sam Fredman, by deposition, introduced into evidence by plaintiffs as part of their case-in-chief,

"Q. Well, how did this transaction first arise? A. Well, Martin Larner approached me (about June 1, 1948) and asked me about the hotel in Granite City. He asked me whether I wanted to sell it. And I said yes, I would sell it. So he says, 'I have got a buyer for it.' I says, 'All right'. So he came over (to Granite City, "maybe within a week or ten days"), he and Mr. Gordon came, and I think that is the first time I ever met Mr. Gordon. * *

"Q. Did Mr. Larner say who the buyer was, or give you the name of the person he had as a buyer? A. No sir; not at the time.

"Q. What connection did Mr. Gordon have in the transaction when he first came there? A. He didn't say anything what connection Mr. Gordon had. All he said was that Gordon was in the office with him.

"Q. You said that Larner was your agent? A. That is right.

"Q. You didn't have any special agreement that he was your agent? A. No sir.

"Q. And you did not agree to pay him a commission? A. Well, we talked about the price of the hotel.

"Q. What was the price? A. I asked him one hundred thousand dollars for it. And then he told me he thought that was too much. So I said, 'Well, I will tell you what I will do, Marty. I will let you have it'. He said, 'I can't get that kind of money for it'. And I says, 'What do you think you can get for it?' He says, 'Well, I can get eighty thousand dollars'. I says, 'No, I want eighty-five'. 'No', he says, 'I can get eighty'. Well, I says, 'I will give you * * *', he says, 'I will give you eighty thousand dollars'. 'No', I says, 'I want eighty-five'. And we dickered around that way, and he says, 'We can give you * * *' well, we figured out and I said, 'Well, all right. I want eighty thousand dollars, I will give you five thousand dollars for your commission'."

In this testimony of defendant Fredman, we point out that Larner is quoted as saying, "I will give you eighty thousand dollars." This isolated sentence is not the language of an agent; yet the whole of the quoted testimony, if believed, would

reasonably support the view that Fredman was treating with Larner as a real-estate broker. As a matter of fact and as stated, plaintiff Larner-Diener is in the real-estate business. Larner-Diener's letterhead indicates that its agents are "realtors" engaged in sales and exchanges of property, and in rental management, loans and insurance; and a reasonable inference from the whole of the quoted testimony of Fredman is that Fredman and Larner were talking respectively as prospective principal and real-estate broker about a possible sale of the hotel so as to net the principal the sum of $80,000 for the property.

Martin Larner, witness for plaintiffs, testified in rebuttal concerning the conversations with defendant Sam Fredman at the country club, and later at Granite City, as follows,

"Q. I believe you testified that your first conversation with Mr. Fredman about the sale of the Steven Hotel was about June 1, 1948? A. I am guessing that is about the date.

"Q. And that conversation took place at the Meadow Brook Country Club? A. I think so.

"Q. At that time you said what to Sam Fredman, and what did he say to you? A. I don't remember what either one of us exactly said.

"Q. Who started the conversation? A. I don't remember which one started the conversation.

"Q. Was something said about the Steven Hotel? A. Something said about it, yes.

"Q. Tell us the best of your recollection what you said to him at that time and what he said to you? A. The gist of the conversation was * * * My best recollection is that the subject came up as to the hotel, or some general conversation was had with reference to hotels, and he mentioned this hotel they had that they had rented it out and that he would like to make a deal on it, and mentioned that he would like for me to take a look at it, and I told him I would phone him and let him know when I was coming over.

"Q. Was that about the entire conversation in brief? A. No. I also told him I would come over and take a look at it and see if we couldn't do something, and I also told him we didn't have a license to operate in Illinois, but maybe we could work something out as principal; maybe we could work someone in on the deal. * * *

"Q. In the drugstore (later, at Granite City), tell us the conversation you and Mr. Gordon had with Mr. Fredman; tell us the best of your recollection what you said, what Gordon said and what Fredman said. A. Well, to the best of my recollection most of the conversation was between Mr. Fredman and myself. I asked Fredman what he wanted for the hotel, and he told me he wanted $85,000.00 net to him, and we could do anything we wanted to with over and above that in any kind of a deal we could make, and I told him I thought it was too much, and after talking quite at length one of the two of us brought it down to the amount of $80,000.00, and it was left at that, that we would try and work out a deal whereby he would get $80,000.00 net to him, subject to proper financing. At that time to the best of my recollection we told him we would have to do some trading, and he wasn't interested in doing any trading, that he wanted that much in money and he didn't care what kind of a deal we made or how we made it."

The trial chancellor was of the opinion and found that, at the time of the negotiation and execution of the contract of sale involved herein, "neither of the plaintiffs represented to the defendants that they were acting or would act as brokers or agents for the defendants in the sale of the aforesaid property, and defendants did not at that time, or at any subsequent time, undertake to make such sale in the belief

that the plaintiffs, or either of them, were so acting." It is true that, considering the quoted testimony of Larner and deferring to the trial chancellor's finding on conflicting verbal evidence, it could be reasonably found that plaintiffs were acting (as "principals") for themselves. It is also reasonable to say, considering the quoted testimony of Larner by itself, that the statement that "maybe we can work out something as principals" was only a way of circumventing plaintiffs' lack of a license to act as agent or broker in real-estate transactions in Illinois. We note the language "we would try and work out a deal whereby he would get $80,000 net to him." See and compare Jewell Realty Co. v. Dierks, supra. We further note testimony of Larner and Gordon that defendant Fredman "told us several times * * * he wasn't interested in what we were making. * * * He wanted to sell his property." However, as we shall see, undisputed testimony of Sam Fredman, the testimony of Larner and plaintiff Gordon and their own conduct, and the testimony and conduct of the straw party (Alton) were such as to clearly establish that plaintiffs were purporting to act as defendants' agents, and that they were representing to defendants that Mamie Alton was the real purchaser of the property. Larner had testified that he never told Fredman that Alton was plaintiffs' straw party. "We assumed he knew that." Upon being asked, "Well, they (defendants) knew she was a straw party, didn't they?" the plaintiff Gordon answered, "Why, sure."

Now, according to the testimony of Fredman, in late July or early August, 1948, Larner told "me he had a woman of substantial wealth and who owned large real estate holdings in the St. Louis area he thought would put up earnest money to buy the property for $85,000 * * * but Larner told me that if she would buy the hotel for that price, that he would want $5,000 for his commission, and the contract would call for $80,000 net." A few days later (apparently August 13th), Larner and Gordon "came back to see me * * * and told me they had a buyer for $85,000, but that they wanted the contract to read $80,000 net, and they would keep $5,000 for their commission * * * we discussed this for a while and then I agreed to sell the hotel on those terms * * * we went over to my lawyer's office, Judge Lueders * * * he prepared the contracts of sale * * * ." Fredman further testified that he was first informed on or about December 8th or 9th that Mamie Alton was plaintiffs' straw party and that plaintiffs were making a secret profit. Fredman talked with plaintiff Gordon about this information. "All of this Mr. Gordon denied and said it is all 'poppy cock.' * * * The next morning Larner phoned me at the store * * * I told Larner the same thing I had told Gordon the night before * * * Larner denied the truth of these charges." None of this testimony was unequivocally disputed.

As stated, the contract of Alton with defendants was to be consummated December 1st, but the closing date was deferred by an extension agreement to December 15th. The extension agreement was signed, "Mamie Alton, Purchaser, by Nat Gordon, Her Agent." December 1st, before the extension agreement was executed, Larner, according to his own testimony, said, in substance, to Judge Lueders, "I am here on behalf of Mamie Alton tendering to you the cash called for under this contract." A letter dated December 10th, typed on the stationery of plaintiff Larner-Diener, was written to defendants reminding them of the deferred closing date, December 15th, requesting them to designate the place for closing, and advising them that, absent notification of the place for closing, the writer would assume the closing would take place on December 15th at Judge Lueders' office. The letter was signed "Mary Alton." December 15th, Larner, plaintiff Gordon, plaintiffs' counsel and Mamie Alton went to Judge Lueders' office at Granite City. According to the testimony, by deposition, of Mamie Alton, Larner there advised Judge Lueders that she (the witness) was Mamie Alton, the purchaser of the property involved, who had been brought over for the purpose of

closing the deal, or words to that effect. Plaintiff Gordon also testified that one of plaintiffs' attorneys made the statement to Judge Lueders on· December 15th, "Judge, we are all here for the purpose of a legal tender of Mamie Alton, the purchaser of the Steven Hotel * * * or words to that effect." Plaintiff Gordon was asked why Mamie Alton accompanied them to Granite City if defendants knew plaintiffs were the purchasers and that Mamie Alton was but a straw party. Gordon answered, "For the ride * * * we liked her company." Larner said, "we took her along to complete the legal picture."

Larner testified it was his company's custom to use a straw party when the company is purchasing properties. The straw party arrangement is "primarily" to enable the company to encumber the properties without incurring deficiency liabilities. And then sometimes, from a psychological viewpoint, it "hurts deals" for the public to know the real-estate company is the owner of the property.

We have mentioned the evidence tending to show plaintiffs had not advised defendants that plaintiffs were the real purchasers of the Granite City hotel and the evidence tending to show plaintiffs' reference to their nominee, Alton, as the "purchaser" in their conversations with defendants and defendants' attorney, Judge Lueders. This evidence, in our opinion, is of weight in support of the conclusion of an assiduous concealment of the plaintiffs' real position as purchasers out of keeping with any legitimate purpose. Having a regard for the evidence tending to support the agency of plaintiffs, the usefulness of a nominee in the transaction becomes quite apparent.

■ It has been noticed that many corporations and individuals transact business affairs in the names of straw parties or nominees. Such a manner or way of transacting business has been examined by the courts. The motives, honest and dishonest; and the advantages and disadvantages, pitfalls and dangers of vesting title to real property in a nominee or a straw party have been observed by McCune Gill in "Strawmen in Missouri," M.B.J., Vol. 14, P. 98; and by Robert N. Cook in "Straw Men in Real Estate Transactions," W.L.Q., Vol. 25, P. 232. The use of a straw party in real-estate transactions is not in itself unlawful or fraudulent. National Refining Company v. Continental Development Corp·, 354 Mo. 402, 189, S.W.2d 551; Benton v. Alcazar Hotel Co., 352 Mo. 836, 180 S.W.2d 33, and cases therein cited; Merrill v. Davis, 359 Mo. 1191, 225 S.W.2d 763. However, the transaction of business affairs in the name of a straw party or nominee conceals or obscures the principal's interest in the transaction, and so the use of a straw party lends itself peculiarly to those who have an unlawful and fraudulent·purpose. So it is, as has been often said, that real estate transactions "made through straw men and ghosts should always be viewed with suspicion." Ryan v. Stubblefield, Mo. Sup., 100 S.W.2d 444, 446; Conrad v. Diehl, 344 Mo. 811, 129 S.W.2d 870; Godwin v. Gerling, 362 Mo. 19, 239 S.W.2d 352; Schaeffer v. Moore, Mo.Sup., 262 S.W.2d 854. See also Houtz v. Hellman, 228 Mo. 655, 128 S.W. 1001.

■ It has been urged by plaintiffs-respondents that an unfavorable inference should be recognized as against defendants-appellants because of their failure to cause Judge Lueders, defendants' counsel, to appear and testify in the trial of the instant action. It is also urged by plaintiffs-respondents that, inasmuch as a "closing statement" of account prepared by Larner-Diener and submitted to Fredman contained the notation "None" in the form at the line provided for the entry of the amount of commission, the only conceivable answer is that Fredman knew plaintiffs represented either themselves or someone other than the Fredmans. The closing statement of account showed a net $80,000 transaction (plus some minor charges, and insurance premium adjustment credits). This is not inconsistent but is consistent with Fredman's testimony that Larner had said the contract of sale was to be on the basis of $80,000 *net*. We have heretofore noted the

testimony of Mamie Alton and plaintiff Gordon that, on December 15th, Larner and plaintiffs' attorney had represented to Judge Lueders that Alton was the purchaser of the property; and have noted the absence of any explanation or denial of such testimony on the part of either Larner or Gordon or of either of plaintiffs' attorneys there present, other than the conclusion of Gordon that "He (Judge Lueders) understood the facts." We surmise the testimony of Judge Lueders in such connection would have been but cumulative.

With due deference to the findings of an able and learned trial chancellor, who, it must be said, had a better opportunity to judge the credibility of the witnesses who appeared before him, we nevertheless are of the view that the clear weight of the evidence introduced in the trial of this case sustains our findings that plaintiffs were defendants' agents and that plaintiffs made no disclosure to defendants of plaintiffs' real interest in the transaction.

It follows that the trial court's order, judgment and decree in favor of plaintiffs for specific performance and accounting should be reversed and the cause remanded with directions to enter judgment for defendants upon plaintiffs' claim for specific performance and accounting; to dismiss defendants' counterclaim with prejudice inasmuch as the actual damages were claimed on the theory of secret profits which plaintiffs cannot now make; to render judgment in favor of plaintiffs and against defendants for $5,000, earnest money, which defendants received and have retained, Houtz v. Hellman, supra; and to assess the costs of this cause against plaintiffs.

It is so ordered.

LOZIER and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.