Francis VANCE and Dolly Vance,
Plaintiffs-Respondents,

v.

STOUT'S TURKEY HATCHERY, INC.,
a Missouri Corporation, Defendant-Appellant.

No. 8072.

Springfield Court of Appeals.

Missouri.

July 11, 1962.

Claude T. Wood, Richland, John A. Honssinger, Lebanon, for appellant.

Donnelly & Donnelly, Lebanon, Cohn & Lentz, Waynesville, for respondents.

McDOWELL, Judge.

This is an action by plaintiffs against defendant to recover the balance due for turkey eggs sold and delivered to defendant during the turkey season beginning October 28, 1958, and ending March 1, 1959. Suit was filed in the Circuit Court of Pulaski County, Missouri, and thereafter transferred on change of venue to the Circuit Court of Laclede County where it was tried by the court (jury waived) and judgment rendered for plaintiffs in the sum of $3,531.75. From this judgment defendant appealed.

The petition alleged, inter alia, that plaintiffs sold and delivered to the defendant turkey eggs, as set out in paragraph 2, consisting of 32 items of sales. Each item bearing the date, number of eggs sold, delivered and accepted by defendant for the price agreed thereon, and prayed for the balance due on said sales in the sum of $4,833.84.

In paragraph 3, it is alleged that sales items 1, 2, 3, 4, 5, 6, 8, 9, 25, 28, 30, 31, and 32, as contained in the schedule in paragraph 2, were paid for by defendant in full

before suit was instituted; that defendant had paid part of the amount due for sales numbered 19, 20, 21, 22, 23, 24, 26, and 27, and alleged there is still due and unpaid $3,531.75 for sales items 7, 10, 11, 12, 13, 14, 15, 16, 17, and 18. It was further alleged that plaintiffs were paid in full for all eggs delivered through November 18th, and for eggs delivered November 29th, December 1, 1958, February 7th and February 16, 1959.

The answer admits the delivery of the eggs to defendant, as alleged in the petition, and the payment made thereon but denies that it has failed and refused to pay plaintiffs for any amount for eggs set forth in sales 7, 10, 11, 12, 13, 14, 15, 16, 17, and 18 of the schedule in paragraph 2 of the petition and denies that there is any balance owed plaintiffs by the defendant for the value of said eggs in the sum of $3,531.75.

The only issue presented to this court is the value of the eggs described in the petition as items of sales numbered 7, 10, 11, 12, 13, 14, 15, 16, 17, and 18. On these items the trial court rendered judgment in favor of plaintiffs in the sum of $3,531.75. The facts are not disputed that the eggs were delivered by plaintiffs to the defendant between November 25, 1958, and January 3, 1959.

Appellant states its position in its argument set out on page 18 of the brief as follows:

"* * * It is the position of Appellant that witness Stanley Traw was an agent for Respondents and as such agent the agreement was consummated between Respondents and Appellant between Christmas, 1958, and New Year's, 1959, which included the aforesaid sales items and under that agreement the price of the eggs included in said items was to be ascertained by the profit, if any, which might be realized from the birds produced from the eggs at their maturity. This agreement covered all of the eggs included in the

aforesaid items for which recovery was allowed by the trial court.

"This agreement provided for an arrangement referred to in the turkey industry as 'consignment' or 'egg pool', whereby Appellant was to hatch the eggs, grow the poults to broiler or market stage, market the mature poults, and if a profit was realized, Respondents were to be paid for their eggs in proportion to the net profit realized from the sale of the birds. If no profit was realized, "Respondents were to receive nothing for their eggs. Under this arrangement, Respondents incurred no obligation for the feed and other expense incident to the hatching, rearing and sale of the poults. The only risk the Respondents incurred under such arrangement was the loss of their eggs. * * * The uncontradicted evidence reveals that Appellant sustained a substantial loss on the transaction.

"Therefore, we assume it will be conceded by Respondents that if the agreement consummated near the end of the year 1958 covered the sales items for which the trial court allowed recovery, the Respondents were not entitled to recover. In other words, we take it that the trial court must have found that an agreement was consummated by Stanley Traw, acting as agent for Respondents, near the end of 1958. But, apparently, the trial court found that this agreement applied only to eggs delivered after January 3, 1959."

The evidence offered by the parties on the issues presented is very conflicting.

Plaintiffs, residents of Camden County, in March or April, 1957, purchased a flock of Beltsville (white) turkeys from defendant, Stout's Turkey Hatchery, Inc., a corporation. At the time of the purchase it was agreed that plaintiffs would sell the eggs produced from this flock to defendant, only. Pursuant to this agreement the eggs produced by plaintiffs in the season of 1957 and 1958 were sold and delivered to the defendant at a price of fifteen cents each. On October 28, 1958, plaintiffs began delivery of eggs to the defendant for the season of 1958 and 1959. Prior to the first delivery it was agreed that defendant would pay plaintiffs for the eggs delivered in 1958 and 1959 the same price as was paid in the season of 1957 and 1958. Defendant did not state how long he would pay this price.

From October 28, 1958, to March, 1959, plaintiffs delivered to defendant 33,143 eggs at a claimed price of fifteen cents each and 32,458 eggs at ten cents each. Defendant admitted the delivery of the eggs, as described in the petition. The only reservation or exception was as to the value of the eggs.

The first six deliveries of eggs in the year 1958, beginning October 28th through November 18th, consisted of 9,598 eggs. Defendant paid for these eggs at fifteen cents each by check dated December 20, 1958, in the sum of $1439.70.

Items 8 and 9, dated 11–29–58, and 12–1–59, a total of 3,575 eggs were paid for by defendant at ten cents each, as shown by defendant's check dated March 2, 1959, in the sum of $357.50. Plaintiff, Francis Vance, testified that he accepted and cashed this check before he realized he was only being paid ten cents an egg.

28,883 eggs contained in deliveries described in items 19 through 32, both inclusive, at practically ten cents each, were paid for by the defendant in two checks, one for $1177.70 dated May 5, 1959, and one July 31, 1959, in the sum of $1018.56.

Deliveries from November 25, 1958, to January 3, 1959, inclusive, being items numbered 7, 10, 11, 12, 13, 14, 15, 16, 17, and 18, amounted to 23,545 eggs, are in controversy. It is plaintiffs' contention that these eggs were delivered to the defendant for a price of fifteen cents each and that there is due and unpaid for them $3,531.75. The judgment of the court was in favor of plaintiffs for this amount so, as stated in the statement of facts of appel-

lant, it is obvious the trial court found that appellant was indebted to respondent for these eggs.

It is the position of appellant that it is not liable to respondents for these eggs until the poults are grown out and marketed and then only if appellant realized a profit from the sale thereof; that the arrangement under which these eggs were delivered was known in the turkey world as "consignment" or "egg pool". There is no contention that appellant realized any profit. So the question to be determined under the issues presented is whether or not the eggs delivered to appellant from November 25, 1958, to and including January 3, 1959, were under an agreement of "consignment" or "egg pool". We agree with appellant's statement in its brief that the trial court found these eggs were not delivered under such an arrangement.

The consignment arrangement was not an issue before November 25, 1958. The appellant claims respondents were informed of the consignment agreement on that date.

Appellant testified that the notification of the consignment arrangement was given respondents orally. In Stout's deposition he gave this answer: "I told them that the poult sales had completely quit, there wasn't no sales for poults, and the only way I could accept the eggs would be consigned." He stated this conversation was made in the Hatchery, he and Vance, alone, being present. He gave this answer: "He said that he didn't think he could afford to deliver eggs then under that condition, and I said 'Well, that's the only way I can accept them'. * * * He asked me to sell the hens, yes."

Francis Vance's Testimony is that he talked with Mr. Stout prior to October, 1958, and they agreed on a price of fifteen cents per egg for the 1958-1959 season. He gave this testimony:

"Q. Now, did you again talk with Mr. Stout in November of 1958 about any change or modification of this agreement? A. I did not.

"Q. Did you talk with Mr. Stout around December 20th, 1958 about any proposed change? A. Yes.

"Q. What did he say? A. He said that he couldn't buy the eggs any longer, that he didn't have no sale for the poults and he wanted the eggs but he didn't want to pay for them, that he couldn't pay for them until after the eggs was hatched and the poults grown out.

"Q. What did you say? A. I told him that I couldn't do that. I asked him to sell the turkeys.

"Q. What did he say? A. He said 'it is too close to the holidays', he says, 'I can't sell them until after the first of the year, but I will sell them right after the first of the year'."

He testified he continued to deliver eggs after December 20th and the evidence is undisputed that he made four deliveries after December 20th amounting to 7,905 eggs, the last delivery being January 3, 1959.

His evidence is that between Christmas, 1958, and New Year's 1959, Stanley Traw, a merchant who sold plaintiffs feed for their turkeys, came to their home concerning a deal he had with Stout's Turkey Hatchery; that Traw met with Stout and, after the meeting, came back and told plaintiffs what they talked about; that Stout wanted the eggs and said he could sell everyone of them for ten cents apiece but that he wanted them to set himself. Traw agreed to feed plaintiffs' turkeys under that agreement. Vance testified he never talked with Mr. Stout about the arrangement but he did agree to the arrangement which Traw conveyed to him from Stout. He gave this evidence:

"Q. You agreed to that. In other words, you agreed to accept 10 cents an egg, is that correct? A. From that time on.

"Q. And that would have been when, Mr. Vance? A. From the time that he started to feed these turkeys.

"Q. When was that, do you know? A. The 3rd of January."

Witness testified that he never saw Mr. Stout very often but that he did talk to him when he tried to sell the turkeys in February. He stated that at that time Mr. Stout told him he wanted plaintiffs to keep the turkeys but they refused to do so. Defendant made arrangements to sell the flock in March, 1959.

The evidence is undisputed that after January 3, 1959, beginning January 10th, plaintiffs accepted ten cents an egg from the defendant. This deduction in price was brought about by a meeting between Stanley Traw and Stout. Traw took it upon himself to see Stout about plaintiffs' eggs. Plaintiffs did not know that Traw was going to do this. In the meeting between Traw and Stout, Stout stated that plaintiffs would be paid.

Stanley Traw testified: That in the fall of 1958 and spring of 1959, he was farming and in the feed business; that he was acquainted with plaintiffs and Carl Stout, President of Stout's Turkey Hatchery. He testified:

"Q. Did you have a conversation with Mr. Carl Stout between Christmas of 1958 and New Years of 1959 concerning the Vance flock? A. Either—yes, sir, except it might have been right after the first of the year a day or two, I don't know just the exact date; that is close.

"Q. What was the occasion for your going to see Mr. Stout concerning the Vance flock? A. I was investigating the deal with Francis Vance.

"Q. Did Mr. Vance know,—did you tell Mr. Vance that you were going to see Mr. Stout before you went to see Mr. Stout? A. I probably told him that I was going—I would go in and talk to him, it wouldn't have made any difference.

"Q. What was said between you and Mr. Vance before you went to see Mr. Stout? A. Mr. Vance came to my place and told me what Stout had told him."

Witness testified that Vance had told him that Stout said he couldn't pay for any more than he had already paid for and would have to take them on consignment.

Traw testified that he said to Mr. Vance "Well, let me go back and talk with Carl!" (meaning Mr. Stout); that he did go to Mr. Stout's home and talked with him about the Vance breeder flock. After talking with Stout, Traw went back to Vance and told him exactly what Stout said and Vance was willing to go along with it. Vance admitted that he agreed to the terms that Traw mentioned when he came back after seeing Stout. Traw testified that Stout had said "that he wasn't afraid of this thing, but what it would straighten up", and he said "I could get 10 cents an egg for the eggs, but I don't want to take it". Witness gave this answer: "A. He says, 'I don't want to take that'. I says, 'Well, Francis said if he wouldn't have to pay the feed bill, if somebody would guarantee the feed bill why that would—I would go ahead and gather the eggs' and I said 'Well, I have sharpened my pencil, it will only cost 6¼ cents an egg to produce these eggs under present conditions' and I said 'if they are worth a dime that will leave you 3¾ cents and that is good pay for taking care of the flock and picking up the eggs.'

"Q. What did Mr. Stout say to that? A. Well, he said, 'Well', he would guarantee the feed bill if it was necessary and I said 'Well, that is not necessary, I can take care of it, if you say that it is this good why we will go ahead'."

Traw testified that defendant stated that plaintiffs would get paid for eggs delivered back in November and December.

Stout testified that in his conference with Mr. Traw he did not recall anything being said about paying for the eggs that had already been delivered.

In a deposition offered in evidence. Carl Stout testified that he was President of Stout's Turkey Hatchery, Inc., in 1958 and 1959; that the eggs in question were delivered and accepted by the hatchery (as alleged in paragraph 2 of the petition) and that the only reservation or exception taken was as to the value of these eggs; that the value of the eggs delivered ceased to be fifteen cents per egg about November 25, 1958. He testified that after that time the eggs were worth what they could get for them; that turkey eggs are worth what you can sell the product that is produced from the eggs. He denied he made any agreement with plaintiffs as to the amount he would pay for the eggs in 1958 and 1959. He gave this testimony:

"Q. What was the understanding? A. That any part of the eggs that I couldn't sell the eggs or poults therefrom would be hatched and grown out and they would be paid accordingly on the profit on the turkeys that was produced from those particular eggs."

He testified that there never was any understanding when plaintiffs would be paid for their eggs. He said that went for all of the eggs delivered as described in paragraph 2 of the petition. He gave this answer: "Yes, until the product was sold at some figure." He testified that he advised plaintiffs that he could only accept eggs by consignment November 25, 1958; that under consignment, the hatchery would finance the feed, grow the turkeys out and assume any loss that might occur above the eggs. He stated that the eggs delivered by plaintiffs to the hatchery before November 25, 1958, were paid for because he had the poults sold for those eggs before they were delivered.

Defendant offered evidence that the custom of the turkey business is that when turkey growers cannot sell the eggs instead of selling their breeder hens they take their eggs to the hatchery and the hatchery stands good for the feed and if any money is made from the poults, then the egg growers are paid out of the profit.

Under points and authorities appellant assigns as error that there was no substantial evidence to support the judgment because:

"(a) Stanley Traw, as the implied agent for respondents, negotiated a new agreement between appellant and respondents, under the terms of which and under the evidence in this case, respondents "were not entitled to recover any amount from appellant.

"(b) There was an agency by ratification and respondents ratified and accepted a new agreement made with appellant by Stanley Traw under the terms of which respondents were not entitled to recover any amounts from appellant."

■ This is a court tried case. The appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. Civil Rule No. 73.01(d), V.A.M.R.; Section 510.310[4] RSMo 1959, V.A.M.S.; Zoglin v. Layland, Mo.App., 328 S.W.2d 718, 719 [1]; Parks v. Thompson, 365 Mo. 700, 285 S.W.2d 687.

It is appellant's contention that a new agreement was consummated by Stanley Traw, acting as agent for respondents, between the parties near the end of 1958, which covered all the sales items for which recovery was allowed by the court and that under the terms of this new agreement the price of the eggs in question was to be ascertained by the profit, if any, which might be realized from the birds produced from the eggs at their maturity; that respondents are not entitled to recover for any amount.

Under sub-head (a) it is contended that Stanley Traw was the implied agent of respondents authorized to negotiate this new agreement.

Appellants cite Larner-Diener Realty Co. v. Fredman, Mo.Sup., 266 S.W.2d 689, 690; Wyler Watch Agency v. Hooker, Mo.App., 280 S.W.2d 849, 854; Hawkins v. Laughlin, Mo.App., 236 S.W.2d 375, 380; and Goodwin & McDowell Motor Co., Inc. v. St. Clair Auto Finance Co., Mo.App., 253 S.W.2d 543, 545.

█ These authorities properly declare the law as to implied agency, that is "The creation of the relation of principal and agent rests in the intention of the parties which may be express or implied, and need not be a conscious intention, but may be determined from the facts and circumstances of the particular case". Larner-Diener Realty Co. v. Fredman, supra, 266 S.W.2d page 690[1, 2]. Agency may be implied from the acts, conduct and acquiescence of the principal. Goodwin & McDowell Motor Co., Inc. v. St. Clair Auto Finance Co., supra, 253 S.W.2d page 545[1, 2]. A holding out of a person to act as an agent is entirely compatible with the theory of implied agency. Baker v. Aetna Casualty & Surety Co., Mo.App., 193 S.W.2d 363.

█ The relationship of agency does not depend in every instance upon an express appointment and acceptance, but is often to be implied from the words and conduct of the parties to the transaction. It is also true that agency need not be shown by direct evidence, but may be presumed or inferred from all the facts and circumstances. Hawkins v. Laughlin, supra, 236 S.W.2d page 380[2–4].

In the instant case we find from the evidence that there is no question but what a new arrangement for the purchase of eggs from respondents by appellant was consummated. The date of consummation is somewhat indefinite. We are sure that the trial court found that this arrangement was consummated January 3, 1959. Mr. Vance testified definitely to that fact. Witness Traw was not sure of the date he talked to Stout. He said it might have been a day or two after the first of the year and, of course, he had to go back and get the consent of respondents, which he did. Respondents testified that they agreed to the terms offered by appellant through Traw. We agree with respondents' contention that even if Traw was the agent of respondents it could not effect the judgment for it is clear from the evidence that it was the judgment of the trial court that the eggs in question were not delivered under this new agreement.

Respondents testified that Traw took it upon himself to see Stout; that they did not know he was going to see Stout. He admits he told Traw about his conversation with Stout on December 20, 1958, wherein Stout said that they could not buy respondents' eggs any longer but could only accept them on consignment and they had refused to deliver eggs on consignment; that Traw's testimony as to respondents knowing about his seeing Stout is indefinite but Traw does say that he thought he might make something out of it. Admittedly, Traw came back to respondents and told them what Stout said.

█ Under the testimony we are of the opinion that the question of agency is immaterial in this case since it is admitted that respondents agreed to the new arrangement made between Traw and Stout and reported back to respondents by Traw. And, further, that under the finding of the trial court the eggs in question were not delivered under the new agreement.

The trial court's judgment is certainly sustained as to all eggs delivered on and prior to December 20, 1958. The serious question presented to this court is the four deliveries made by respondents to appellant after December 20, 1958, which includes the January 3, 1959, delivery, consisting of 7,905 eggs.

■ We are not bound by the chancellor's findings but review the evidence de novo and reach our own conclusion as to the weight and value. However, we usually defer to the chancellor's findings when the cause turns upon the credibility, weight and value of the oral testimony of witnesses who have personally appeared before the trial court, unless we are satisfied that the findings should have been to the contrary. Middelton v. Reece, Mo.Sup., 236 S.W.2d 335, 341; Zoglin v. Layland, supra.

■ The facts are undisputed that the four deliveries of eggs made after December 20, 1958, were accepted by the appellant. Respondents testify that the new arrangement upon which appellant relies became effective January 3, 1959. Traw testified that in this conversation between himself and Stout, resulting in the new agreement, Stout not only stated that eggs delivered by respondents would be paid for at ten cents each, but testified that Stout, in that conversation, stated that respondents would get paid for the eggs they had already delivered. Stout, testifying for appellant, stated he did not remember that there was anything ever said about eggs which had already been delivered. This evidence, coupled with the admitted fact that respondents refused to deliver eggs on consignment and asked appellant to sell his turkeys, we think justifies the judgment of the trial court in finding that the new agreement, relied upon by appellant, did not apply to the delivery of the eggs in question and in rendering judgment for respondents for the eggs delivered between November 25, 1958, up to, and including, January 3, 1959.

Judgment affirmed.

RUARK, P. J., and STONE, J., concur.