252 S.W.2d 108 (1952)
TRUCK LEASING CORP.
v.
ESQUIRE LAUNDRY & DRY CLEANING CO.
No. 21736.
Kansas City Court of Appeals, Missouri.
October 6, 1952.
*109 Reed O. Gentry, Rogers, Field & Gentry, Kansas City, for appellant.
White & Hall, Kansas City, for respondent.
BOUR, Commissioner.
This is an action to recover damages for an alleged breach of a written contract of bailment. The trial court rendered judgment for defendant and plaintiff appealed. Since the case was tried before the court without a jury, it will be reviewed upon both the law and the evidence as in suits of an equitable nature, and the judgment will not be set aside unless clearly erroneous. Sec. 114(d), p. 388, Section 510.310(4), RSMo 1949, V.A.M.S.
Plaintiff is a corporation engaged in the rental of trucks and other motor vehicles. Defendant is a corporation engaged in the laundry and dry cleaning business in Kansas City, Missouri. On June 19, 1948, these corporations entered into a written contract whereby plaintiff leased a certain Dodge truck to defendant and the latter agreed to pay plaintiff a weekly "standby" charge of $18.40, plus five and one-half cents for each mile the truck was driven. After alleging the above facts and that section C, paragraph 2 of the contract provided that defendant agreed "not to permit said vehicle to be driven beyond the limits of the greater Kansas City area, unless written permission of Lessor is first obtained, and then only at Lessee's own sole risk and expense," plaintiff charged in its petition "that during the time of said lease agreement, and while the aforesaid vehicle was in the possession of the defendant, by virtue of the terms of said lease agreement, said vehicle was caused to be driven beyond the limits of the greater Kansas City area to Columbia, Missouri in direct breach of the terms of said agreement, and while said vehicle was en route between Columbia, Missouri and Centralia, Missouri on Highway No. 63, said vehicle was wrecked and damaged in the sum of * * * $543.61"; that "said damage directly resulted from the breach of the terms and provisions of said lease agreement"; that "by reason of the breach of said agreement * * * plaintiff was caused to lose the use of said vehicle in its business and required to furnish another vehicle in substitution therefor, all to its damage in the sum of * * * $200.00." Plaintiff prayed judgment for $743.61. A copy of the contract was attached to the petition.
Defendant admitted the corporate capacity of the parties; admitted that the parties entered into the written contract described in the petition; and denied all other allegations of the petition. No question has been raised as to the sufficiency of the pleadings.
It appears that under the terms of the contract it was the duty of plaintiff to service the truck and furnish storage space and all necessary license tags, to maintain the truck in good condition and repair, and to furnish all tires, tubes, gasoline and lubricants necessary for the operation of the vehicle. The contract further provided that "all vehicles leased under this agreement shall be operated only by safe, careful and licensed drivers to be selected, employed and controlled by Lessee, said drivers being conclusively presumed to be agents of Lessee only * * *." Other provisions of the *110 contract will be referred to in the course of the opinion.
The evidence showed that after the parties executed the contract the Dodge truck was used by defendant for the collection and delivery of laundry and other articles. Plaintiff's garage and place of business was located in Kansas City, Missouri. Arthur Callies, a "route man" selected and employed by defendant, began to drive the truck in September, 1948. He testified as a witness for plaintiff that in accordance with instructions given him by Mr. Epstein, defendant's general foreman, he would get the truck at plaintiff's garage about 6:45 a. m., drive it to defendant's plant where he would pick up laundry and the like and then deliver the same to customers; that after covering his route he would drive back to defendant's laundry, check in, and then return the truck to plaintiff's garage for service and storage until the following morning; that he usually completed his work about 4:00 or 4:30 p. m.; that he followed this procedure until the afternoon of November 20, 1948. He admitted that his route did not extend beyond the limits of Kansas City, Missouri, and that his duties did not require him to operate the truck outside the limits of that city.
Callies also testified as follows: On November 20, 1948, he went to plaintiff's garage about 6:45 a. m., got the Dodge truck and performed his usual duties until about 4:00 or 4:30 p. m., when he stopped to eat in a restaurant near defendant's laundry. While there he met a friend and "on the spur of the moment" they decided to go to Columbia, Missouri to see Callies' estranged wife and try to effect a reconciliation. Callies did not return the truck to plaintiff's garage. Instead, he disconnected the speedometer and drove the truck to Columbia, where he learned that his wife had gone to Centralia, Missouri. He then drove towards Centralia on a two-lane highway, and while traveling around a curve at a speed of 45 to 50 miles an hour, he lost control of the truck. The truck left the road, turned over and was damaged. The accident occurred about 11:00 p. m., and no other vehicle was involved. Callies' friend did not testify.
Defendant states in its brief that the accident was caused by "a defective tire which blew out." The record shows that defendant attempted to prove by Callies, on cross-examination, that a defective tire blew out, causing him to lose control of the truck. We need not summarize that part of Callies' testimony as it is not material to the issues in the case. It may be stated, however, that there is no testimony in the record from which it can be reasonably inferred that the tire in question was defective.
Concerning the trip described above Callies, on cross-examination, further testified:
"Q. Now you didn't get any permission from anyone at the Truck Leasing Company or anyone at the Esquire Laundry Company, did you? A. No.
"Q. And no one at either the Truck Leasing Company or the Esquire Laundry Company knew you were going, did they? A. No. * * *
"Q. The first that you told anybody about it was the next day when you called the Truck Leasing Company? A. That is right. * * *
"Q. And you weren't going down on this trip for any business of either the Truck Leasing Company or the Esquire Laundry Company? A. No.
"Q. It was purely your own private trip for your own private purpose? A. That is right."
Daniel F. Bodney, a witness for defendant, testified that he was manager, and secretary and treasurer of defendant corporation; that in his capacity as manager he employed Callies as a route man for defendant; and continued: "I explained to him that we were leasing the trucks and that he would have to pick up his truck at the Truck Leasing Company in the morning and when he was through at the end of the day to take the truck back there, that he couldn't take it anywhere, that he couldn't take it outside the city limits," and that "he couldn't take it anywhere for his own personal use." He further testified that *111 Callies made the trip in question without his knowledge or consent.
So much for the facts. While plaintiff has listed three separate points in its brief, they all amount to the contention that the court erred in rendering judgment for defendant. In view of the conclusions we have reached it will not be necessary to consider two of the points briefed by plaintiff.
As stated, section C, paragraph 2 of the contract of bailment provided that defendant agreed "not to permit said vehicle to be driven beyond the limits of the greater Kansas City area, unless written permission of the Lessor is first obtained, and then only at Lessee's own sole risk and expense." (Italics ours.) Plaintiff contends that there was a breach of this provision on November 20, 1948, when the truck was driven beyond the limits of said area without plaintiff's consent. Defendant denies that it violated the provision. In support of its position defendant argues, first, that in construing the contract the ordinary meaning of the verb "permit" must be given effect; that this verb, in the ordinary sense, means "to grant leave or permission by express consent or authority, and necessarily implies that the thing permitted was with the knowledge and consent of the permitting party"; that the undisputed evidence showed that "the taking by the driver was without its knowledge or consent and contrary to express orders;" therefore "defendant did not `permit' the truck to be taken outside the Kansas City area." Defendant cites Hill v. Montgomery, 352 Mo. 147, 176 S.W.2d 284, and Winslow v. Missouri, K. & T. R. Co., Mo.App., 192 S.W. 121. We have considered these cases, but they are not in point.
In 70 C.J.S., Permit, at page 565, it is stated: "The verb `permit' is derived from the Latin word `permittere' which means to concede, to give leave, to grant * * *. It is a word in common and frequent use, of considerable elasticity, and lacking clear-cut and precise definiteness. It is not a technical word, and in English it has two significations * * *. In the first sense it means affirmative action, an authorization, being properly used with reference to permanent authority, and implying knowledge intention, and consent, although such rule is not without exceptions. In the second sense it means negative action, something less than consent, implying no affirmative act and involving no intent, but being mere passivity; abstaining from preventive action." See Webster's New International Dictionary, 2 Ed.; Crabb's English Synonymes; 32 Words and Phrases, Permit, p. 144. While the word is one of variable meaning, it is said that every definition of the word includes knowledge of what is to be done under the permission; that a person cannot permit an act to be done or a condition to exist of which he has no knowledge. Cf. Gregory v. United States, Fed.Cas.No.5803, 17 Blatchf. 325, 331. This may be true, but the cardinal rule to be observed in construing a written contract is to ascertain and give effect to the intention of the parties, and "greater regard is to be had to their clear intent than to any particular words they may have used in attempting to express it." Larson v. Crescent Planing Mill Co., Mo.App., 218 S.W.2d 814, 819.
The language of a contract should be given its ordinary and usual meaning unless it is clear that some special or peculiar meaning was intended by the parties. Burress v. Blair, 61 Mo. 133, 140; Good v. Erker, 170 Mo.App. 681, 688, 153 S.W. 556, 558; 12 Am.Jur., Contracts, sec. 236, p. 758; 3 Williston on Contracts, sec. 618, p. 1777. It is commonly said that in arriving at the intention of the parties, where the language of a contract is susceptible of more than one construction, the court should consider the relationship of the parties, the subject matter of the contract, and the apparent purpose which the parties to the contract were undertaking to accomplish. Wells v. Thomas W. Garland, Inc., Mo.App., 39 S.W.2d 409, 411. The entire contract should be considered in determining the meaning of each part. In re Trust Estate of Collins, 354 Mo. 614, 621, 190 S.W.2d 259, 262. It may be stated here that the evidence in the case at bar does not show whether the contract of bailment was prepared by plaintiff or defendant.
*112 To repeat, defendant contends that the verb "permit," as used in the provision in controversy, means "to grant leave or permission by express consent or authority." As to the Dodge truck, plaintiff was a bailor, and defendant was a bailee, and the bailment was for the benefit of both parties. Defendant hired the truck for use in its business. As stated, the contract provided that "all vehicles leased under this agreement, shall be operated only by safe, careful and licensed drivers to be selected, employed and controlled by Lessee, said drivers being conclusively presumed to be agents of Lessee only * * *." Pursuant to the agreement defendant employed a driver, and he was given possession of the truck about 6:45 a. m. every work day. Possession by the driver became the possession of defendant, and so continued, for the purposes of defendant's contractual obligations to plaintiff, until the truck was returned to plaintiff's garage. Under the terms of the contract, defendant was the party to exercise control over the driver and the truck. It is apparent that plaintiff could not do so. Under these circumstances, it does not seem reasonable that the parties contemplated that the words "not to permit," as used in the provision in question, should mean only "not to consent."
It is significant that the parties used the words "not to permit" in five other provisions of the contract. For example, paragraphs 3 and 4 of section C read as follows: "Lessee agrees: * * * (3) Not to permit said vehicles to be overloaded, and if damage is occasioned to said vehicles because of overloading, then Lessee agrees to pay all reasonable charges for the repair of said vehicle or vehicles, said repairs to be made by Lessor if it shall so direct. (4) Not to permit any vehicle to be driven on any flat tire or any tire which does not contain sufficient air pressure to prevent damage to the sidewalls thereof other than ordinary wear and tear, and if tires are damaged by reason of the default or neglect of Lessee in these respects, to pay for same." Can it be reasonably said that the parties intended that the words "not to permit," as used in these provisions, should mean only "not to consent?" We think they had no such intention. It seems clear that these provisions required defendant to see to it that the truck was not overloaded and that it was not driven on a flat tire or a tire not properly inflated. And when due regard is had for all pertinent facts indicative of the intention of the parties, we think the provision in controversy must be construed to mean that defendant was under a duty to see to it that the truck was not driven beyond the limits of the greater Kansas City area without plaintiff's written consent. (Of course, defendant was not responsible for the truck while it was in plaintiff's garage.) Since the truck was driven beyond the limits of said area without plaintiff's consent, defendant is liable for breach of the contract, unless it be a defense that the driver, Callies, was acting beyond the scope of his employment.
Defendant's main contention seems to be that it was not responsible for the damage complained of because Callies was acting beyond the scope of his employment and solely for his own purposes when the accident occurred. In support of this contention defendant cites Becker v. Donahue, Mo.App., 168 S.W.2d 960, where the plaintiff sued the defendant company to recover damages for personal injuries alleged to have been caused by the negligence of the company's salesman in driving an automobile. It was held that the company was not liable under the doctrine of respondeat superior, since the evidence conclusively showed the salesman was not acting as the servant of the company at the time of the accident. For the reasons stated below, we do not believe this case is in point. Defendant further states that Callies "not only ceased to be the agent of defendant as a matter of law when he left Kansas City to start on a mission of his own, but he also committed a crime," citing section 560.175, RSMo 1949, which provides: "1. No person shall drive, operate, use or tamper with a motor vehicle or trailer without the permission of the owner thereof." In this connection defendant says "it was never intended that defendant would become responsible for a driver's wrongful, criminal act, in violation of the law, without the knowledge or consent of the defendant. *113 As stated in 2 C.J. p. 431, `There can be no such thing as agency in the perpetration of a crime.'" See also 2 C.J.S., Agency, § 13. Assuming without deciding that Callies violated the statute cited by defendant, we think there is no merit in this contention.
It is true that "unless one has directed a specific tortious act or result or has been negligence, he is normally not responsible for the conduct of others, except that of his agents or servants acting within the scope of their employment. By contract, however, or by entering into certain relations with others, a person may become responsible for harm caused to them by conduct of his agents or servants not within the scope of employment." Restatement, Agency, sec. 214, Comment a.
It should be kept in mind that the instant suit is based on an alleged breach of a contract of bailment. In 6 Am.Jur., (Rev.Ed.), Bailments, sec. 266, p. 372, it is stated: " * * * the trend of the modern authorities is toward the rule that the doctrine of respondeat superior cannot be invoked to relieve any bailee of his liability, based on the contract of bailment, for breach of a duty to the bailor which he has undertaken to perform through the agent or servant; this is held to be true even though such employee was acting for his own purposes, without authority or contrary to instructions, and notwithstanding the bailee's own freedom from negligence in his selection and retention and in other respects." See also 8 C.J.S., Bailments, § 27a(2), p. 274; 6 Am.Jur. (Rev.Ed.), Bailments, sec. 172, p. 290, and sec. 224, p. 329; 57 C.J.S., Master and Servant, § 570e(1), p. 314; 61 C.J.S., Motor Vehicles, § 726, p. 869. This rule is followed in a majority of jurisdictions, and in our opinion it is based on sound reasoning. Among the numerous cases in accord with the majority view are Bowles v. Payne, Mo.App., 251 S.W. 101; Pratt v. Martin, 183 Ark. 365, 35 S.W.2d 1004; Maynard v. James, 109 Conn. 365, 146 A. 614, 65 A.L.R. 427; Walters v. United States Garage, 131 Me. 222, 160 A. 758; National Liberty Ins. Co. of America v. Sturtevant-Jones Co., 116 Ohio St. 299, 156 N.E. 446, 52 A.L.R. 705; Metzger v. Downtown Garage Corp., 169 Pa.Super. 384, 82 A.2d 507; Powell v. A. K. Brown Motor Co., 200 S.C. 75, 20 S.E.2d 636.
In Bowles v. Payne, supra, an action against a terminal railroad association to recover the value of a trunk and contents, the St. Louis Court of Appeals in affirming a judgment for the plaintiff said, 251 S.W. at page 103: "In the instant case there is no dispute as to the bailment and the failure of defendant to return the property on demand. The only testimony adduced concerning the loss is that of plaintiff's witnesses. While that testimony tends to show the exercise of care on defendant's part to preserve baggage remaining in its possession, it warrants the inference that plaintiff's trunk was stolen from defendant's baggageroom by some employee or employees of defendant or through collusion with defendant's employees or some one of them. * * * And while the rule is that a master is not liable for crimes or torts committed by his servant without the scope of the employment, and to effect the servant's own purpose, the master is liable where the crime or tort by the servant is in and of itself a violation of some duty which the master has assumed toward the person thereby injured, and which the master has undertaken to perform through the servant." Compare the earlier decision of the same court in Evans v. A. L. Dyke Automobile Supply Co., 121 Mo.App. 266, 101 S.W. 1132, where the court considered the action to be one sounding in tort and disposed of the case on that theory.
In one of the leading cases on the subject, National Liberty Ins. Co. of America v. Sturtevant-Jones Co., supra, the evidence showed that the defendant company, pursuant to an agreement with the owner of a motor car, sent one of its employees to Finley, Ohio, with instructions to drive the car from Finley to defendant's service station in Toledo, Ohio, and there deliver it to the owner. The employee took possession of the car at Finley and drove it to Toledo. Upon arriving in Toledo he did not drive the car to defendant's service station, but in violation of his instructions, and in violation of his employer's contract with the owner, drove it to his own home, *114 then to a dance hall, and then on a pleasure trip. While the car was being so used, it backfired, caught fire, and was destroyed. The plaintiff insurance company paid the owner for the loss, and took an assignment from him of his claim against the defendant. The trial resulted in a judgment for the defendant. In reversing the judgment the Supreme Court of Ohio said:
"The distinction between the doctrine by which the master is held liable for a breach of his contractual obligation to another, notwithstanding the fact that the breach was committed by his servant without his knowledge or authority, while the subject of contract was in the possession of the servant by the authority of the master, and the doctrine by which the master is held not liable for the tort of his servant committed while the servant authorizedly is in possession of the master's property, but is using it for his own purpose and not for the purpose of the master, is that the doctrine first above relates to a contractual obligation to a stranger to the servant, which the master has himself assumed and entered into, and from which he cannot absolve himself save by performance; and since he elects to perform through his servant, the servant acts in his place and stead and can no more extinguish the obligation of his master under the contract by any act of his than the master can by his own act; whereas, the latter doctrine relates to no contractual obligation entered into by the master, but to a duty imposed by law upon every member of society, and liability thereunder arises from a violation of duty. If, then, the servant violates a duty and incurs liability while he is acting for himself and not for his master, the liability is his. The master is not absolved from an existing liability by the act of the servant; he simply has not incurred liability. * * *
"Without any attempt to reconcile, distinguish, or follow the cases decided in the various jurisdictions outside of Ohio, we are of opinion that Ohio is wisely committed to the doctrine that, as applied to contractual obligations to third persons, the possession confided to the servant by the master is still the possession of the master, and so continues, for the purposes of the master's contractual obligation to a third person, until the master has performed his contractual obligation, or, as against the servant, has repossessed himself; that an act done by the servant which results in injury to the property of a third person, in the possession of the servant by the authority of the master, is the act of the master, for which the master is responsible upon his contractual obligation to such third person, notwithstanding the fact that the particular act which causes the injury and creates the damage is done in violation of the master's instructions." [116 Ohio St. 299, 156 N.E. 449.]
In our opinion the instant case comes within the rule stated above. The undisputed evidence showed that Callies was on duty as defendant's driver when the truck was turned over to him on the morning of November 20, 1948; that he was authorized by defendant to take possession of the truck; and that he had exclusive and continuous possession from about 6:45 a. m. until some time after the accident. It is true that he had been instructed by defendant's foreman and manager not to use the vehicle for his own purposes, and not to drive it beyond the city limits. But this did not relieve defendant from the obligation of its contract. Applying the law as stated above, we think plaintiff was entitled to recover from defendant the amount of damages sustained by it as the result of Callies' wrongful conduct. The fact that Callies was acting beyond the scope of his employment and contrary to instructions in driving beyond the limits of the Kansas City area was immaterial.
What we have said herein disposes of the question of defendant's liability to plaintiff for breach of the contract. The judgment for defendant should be reversed and the cause remanded with directions to the circuit court to hear and determine the issue as to the amount of damages, and to enter judgment for plaintiff and against *115 defendant for whatever amount may be found. The Commissioner so recommends.
SPERRY, C., concurs.
PER CURIAM.
The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment of the circuit court is reversed and the cause remanded with directions as recommended by the Commissioner.
All concur.