**WYLER WATCH AGENCY, Inc., a corporation, Plaintiff-Appellant,**

v.

**Harbert D. HOOKER, d/b/a Hooker Jewelry Company, Defendant-Respondent.**

No. 7325.

Springfield Court of Appeals.

Missouri.

June 6, 1955.

Byron Kearby, Poplar Bluff, for plaintiff-appellant.

O. A. Tedrick, John A. Casey, Poplar Bluff, for defendant-respondent.

STONE, Judge.

Plaintiff, Wyler Watch Agency, Inc. (hereinafter referred to as Wyler Watch), with its principal office in the City of New York, sued defendant, Harbert D. Hooker, for $2,914.55 on a running account for Wyler watches sold to defendant. In his answer, defendant admitted purchase of the watches at "the prices" charged in plaintiff's statement of account, which "were reasonable and proper." But, "by way of an affirmative defense," defendant

averred "that said merchandise was to be paid for out of the proceeds realized from the production and sale of an invention of defendant, which plaintiff agreed to market for the mutual advantage" of both plaintiff and defendant. As described in defendant's patent application, his invention (hereinafter referred to, as did the parties in their testimony, simply as the machine) was a mechanical device "which will automatically subject a watch or other article to repeated impacts against an abutment or backstop and immersion in a water-filled container, intermittently withdrawing the watch from the container and returning it to its initial position."

In his counterclaim, defendant averred that one Samuel Bitkower of Chicago, a sales representative of Wyler Watch, after seeing "a working model" of the machine, "requested he redesign said machine into a smaller and more compact model and then, if defendant could obtain a patent thereon, plaintiff would buy the machine for sale to their dealers"; that defendant "accordingly did redesign and perfect a smaller model" which, after it had been patented, was exhibited to Alfred Wyler, President of Wyler Watch, in New York; that thereafter in May, 1950, Bitkower "requested permission to take the machine to Chicago to see what it would cost to have them made"; that Bitkower subsequently advised defendant that "he (Bitkower) had employed a firm to make the plates and molds for the machine and that he could have them manufactured for * * $37 each, and that plaintiff would pay all expense of labor and material in developing the machine and deduct such expense from the sale thereof when production was under way, * * * to which proposition defendant agreed"; and, that defendant expended $3,000 "in the developing, redesigning, patenting and other matters incident to the production of the machine in accordance with the agreement with plaintiff, as aforesaid." (All emphasis herein is ours.) Defendant further averred that plaintiff, through Bitkower, made false, fraudulent and malicious representations to defendant "concerning the manufacture

and marketing of his invention," by reason of which defendant also sought punitive damages of $10,000.

Following trial, judgment for $2,914.55 was entered on plaintiff's petition. In respect to defendant's counterclaim, the court found that "defendant was led to believe by the actions of the plaintiff that said Bitkower was their agent and representative in the matter of the perfecting, manufacturing and * * * sale of said machine"; and that, relying thereon, "plaintiff made numerous trips securing parts and to perfect the machine and much time and effort * * * to make a finished model," for which "he should be compensated." Finding also that plaintiff "through its agent Bitkower wrongfully and wilfully deprived defendant of his money, his time, his efforts and have failed to perform their part of the agreement and have misled the defendant and maliciously caused him damage," the court entered judgment on defendant's counterclaim for $1,984 actual damages and $2,500 punitive damages, directed that the judgments on the petition and counterclaim be offset, and authorized execution against plaintiff for $1,569.45. Significantly, the judgment did not indicate what "the agreement" was.

The primary issue in this case is as to the nature and scope of Bitkower's agency as a sales representative of Wyler Watch. Defendant owned and operated jewelry stores at Poplar Bluff, Missouri, and at Piggott and Rector, Arkansas. When salesman Bitkower first called on defendant (at a time in 1947 or 1948 not fixed definitely in the record), he saw the first working model of a shock resistance demonstrator, which however was, as defendant stated it, "too large and bundlesome and wouldn't be practical"; but, according to defendant, Bitkower then said "if I (defendant) could develop something that would be useful and practical that Wyler Watch Agency would be glad to buy it from me." Defendant "finally got a model entirely different from the first, but for the same purpose." That was the machine patented. After defendant had perfected the machine, he wrote Wyler

Watch in New York on August 22, 1949, describing the perfected machine and suggesting that "if you or any of your men are coming this way *I would like to sell the machine to you* as I do not have finances to manufacture them and to put them on the market." On August 26, 1949, Paul Wyler, Vice-President and Treasurer of Wyler Watch, replied that, since *"we do not exactly know what it is all about,* we would like you to wait until our sales representative passes through Poplar Bluff, *in order that he may send us a full report in the matter."* During the Fall of 1949, Bitkower called on defendant in Poplar Bluff. "On this particular trip *he just told me (defendant) he couldn't do anything,* and suggested that I take the machine and go to Washington and get it patented * * *. They was already working on the patent and it would increase the speed to go there." Thereafter, defendant went to Washington, D. C., in connection with his patent application and then proceeded to New York, where he talked with Alfred Wyler, President of Wyler Watch, about the perfected machine. *When asked whether "you were in hope that Wyler would buy your patent,"* defendant answered, "that was my business up there";* and, to the specific inquiry as to whether Alfred told him then that Wyler Watch "would buy the patent," defendant replied "no,* said they wanted the brother (Paul Wyler) to see it." Paul was gone that day and defendant returned to Poplar Bluff without seeing him.

"Some few days" later, defendant received a telegram from Alfred Wyler (not offered in evidence) asking "where the machine was, *they wanted to see it."* Defendant told Alfred Wyler that the machine was in Poplar Bluff, and Alfred is reported to have said that *"they would have someone come and see about it."* In May, 1950, Bitkower came to Poplar Bluff again. On that occasion, Bitkower's "proposition" was, as stated in defendant's testimony, "that he (Bitkower) wanted to take the machine to Chicago where they could get * * * them manufactured cheaper and *then we would make an agreement*—he would take the machine to Chicago, and *would try to see what he could get the plates and molds made for, and get the machine manufactured for,* and he left with the machine."

In August, 1950, Bitkower told defendant in a long distance telephone conversation "that the forms and molds (for use in commercial production of the machine) had been made and six machines were ready and he was bringing one of them" to Poplar Bluff. When Bitkower did not come to Poplar Bluff shortly, defendant unsuccessfully endeavored to contact him over long distance. Finally, defendant talked to a stenographer, told her that he "needed one of the machines" for demonstration at a county fair, and *within "just a few days I got the original model back."* In November, 1950, defendant went to Chicago and talked with Bitkower personally. According to defendant, Bitkower then said that he had had a "company to build the molds and the plates"; that they were to manufacture the machine for $37 each; that, after "they got six manufactured, * * * they raised the price to $67"; that Bitkower "found another company that would make them for $37"; but that, when he (Bitkower) sought "to get his plates and molds to take them to the other man," the first "wouldn't let him (Bitkower) have them." Bitkower assured him that "he had arrangements to go into production immediately, but he had to wait to get the molds and forms," for recovery of which Bitkower said that he had brought a suit which was set for hearing "the following week from the time I was there."

Although defendant said that he went to Chicago in November, 1950, "to see why (the machine) wasn't being manufactured," that obviously was not the only purpose of the trip. As defendant explained, "I was desperate in need of watches" for Christmas trade but did not have ready funds to purchase them. So, defendant proposed to Bitkower that *"I would like to have $6,000 worth of watches, but I wanted to pay for them this way, when you sell the machine after you pay for the molds and plates, some $5,100, that you continue to keep all the rest of my*

*money until they (the watches) are paid for.*" Although defendant said that "Bitkower agreed immediately, * * * *I insisted that he call Mr. Wyler,*" which Bitkower did. According to defendant, Bitkower concluded this long distance telephone conversation with Wyler, "I am going to let Mr. Hooker have the watches as per his agreement," but significantly defendant did *not* testify that Bitkower then told Wyler what the alleged "agreement" was. Bitkower's version was that he had called Alfred Wyler to arrange for credit to be extended to defendant in excess of $1,500, the "ceiling" admittedly theretofore fixed by Wyler Watch for sales to defendant on open account. At that time, Bitkower delivered certain watches from stock on hand in Chicago—defendant thought "around $2,000 worth"; and, "in just a few days I got around $2,000 worth more from New York." But defendant "didn't get $6,000 worth," the amount that he said that he had needed; and, the itemized statement of defendant's alleged indebtedness includes charges aggregating only *$2,795.05* from November 24, 1950, to the end of that year.

While in Chicago on November 21, 1950, *defendant and Bitkower* entered into the only written agreement reflected in the record, which read as follows: "This is to certify *an understanding between* Mr. Harbert D. *Hooker*, of Poplar Bluff, Missouri, *and* Mr. Samuel *Bitkower*, of Chicago, Ill. *Samuel Bitkower* is to represent a mechanical device constructed by Mr. Hooker and a consideration of 15% commission regarding the price of the above machine. *Samuel Bitkower* will be the sole distributor for the above device and Mr. Hooker will be the sole owner." When on January 8, 1951, defendant got a bill from Wyler Watch for $3,914.20 (*which included $1,119.15 for purchases prior to his Chicago trip*), he called Bitkower over long distance, locating him at the office of Wyler Watch in New York. Defendant testified that Bitkower then said "you just stop worrying about that, * * * I will take care of it today * * * and tomorrow we will let the contract for the machine

(to) start in production." Pursuant to Bitkower's suggestion, defendant wrote Wyler Watch "to have Mr. Wyler * * * mark the bill paid." Upon receipt of this letter, Alfred Wyler promptly called defendant over long distance. "He wanted to know why I (defendant) sent a bill up there to be marked paid when I didn't send the money with it, and I went through the entire detail with him again, as I went through it with Mr. Bitkower when we bought the watches, that they were not to be paid for and *the money was to be taken out of the machine that was to be manufactured as per his agreement in Chicago.*" Bitkower, who was on a telephone extension and participated in this conversation between Alfred Wyler and defendant, denied having suggested that defendant send "the bill to have it marked paid" and said "that he was working individually * * * he was just trying to help me." In that conversation, Bitkower gave defendant "the name and address of a company" in Chicago where, as Bitkower said, defendant could find the molds and plates. Defendant discovered the same day that the name given to him by Bitkower was fictitious and that the address was a vacant lot, so he undertook to contact Bitkower again at the office of Wyler Watch in New York. When Bitkower refused to talk, defendant talked with Alfred Wyler. "He said it is all a sad misunderstanding, *that he knew nothing about it at all during the time* * *. *. 'He said pay for them (the watches) as quick as I could and he would see that I got my molds and forms and finished machines * * * back, and *I agreed to that.*" "*Mr. Wyler agreed to get Mr. Bitkower to get that done,* and I was going to pay this whole outfit (bill) off, and I went to paying on it." Defendant subsequently made payments of $500 each to Wyler Watch on April 11 and June 29, 1951. But, when Bitkower sent no plates, molds or finished machines to him, defendant "got tired paying" and "finally told (Alfred Wyler) I was through until I would get my things back; that *whenever I would get them back, then I would go ahead.*"

█ In our determination of this case, we have given no consideration to Bitkower's testimony, excepting insofar as it might aid defendant, and nothing herein should be misconstrued as approval of the course of conduct followed by Bitkower, which, to state it charitably, smacked of duplicity, deception and chicanery. · But it does not follow that defendant thereby should recover on his counterclaim. It is settled that one, who deals with a known agent, is charged with the duty of ascertaining for himself the scope of the agent's authority. Johnson v. Hurley, 115 Mo. 513, 519–520(2), 22 S.W. 492, 493; Murphy v. Holliway, 223 Mo.App. 714, 16 S.W.2d 107, 112(3); 2 C.J.S., Agency, § 93a(1), page 1193. See and compare also Grady v. John Hancock Mut. Life Ins. Co., Mo.App., 150 S.W.2d 574, 578–579(4); Bennett v. Royal Union Mut. Life Ins. Co., 232 Mo. App. 1027, 112 S.W.2d 134, 141(5); Kahn v. Philadelphia Fire & Marine Ins. Co., Mo.App., 108 S.W.2d 457, 461(4); Gibson v. Texas Prudential Ins. Co., 229 Mo.App. 867, 86 S.W.2d 400, 406(5); Springfield Gas & Electric Co. v. Southern Surety Co. of Oklahoma, Mo.App., 250 S.W. 78, 80(4). It is not claimed that Wyler Watch conferred any *declared or expressed authority* upon Bitkower to make any "proposition" to, or agreement with, defendant for manufacture and sale of the machine [Mechem on Agency (2nd Ed.), Vol. 1, Sec. 714, p. 501], but defendant's contention is that Bitkower had *implied authority* so to act on behalf of Wyler Watch. "Implied agency is actual agency which is to be established by proof of circumstances bearing on the question; that is, by deduction or inference from other material facts in the case." Farm & Home Savings & Loan Ass'n of Missouri v. Stubbs, 231 Mo.App. 87, 98 S.W.2d 320, 333(10); Thimmig v. General Talking Pictures Corporation, Mo. App., 85 S.W.2d 208, 211(1). "Implied authority is actual authority of which direct proof is lacking, but which is to be implied or inferred from relevant facts and circumstances in the case." Baker v. Aetna Casualty & Surety Co., Mo.App., 193 S.W.2d 363, 367(10). Implied agency, which is an actual agency, is distinguishable from agency by estoppel, which is an apparent or ostensible agency [Austin-Western Road Machinery Co. v. Commercial State Bank, Mo.App., 255 S.W. 585, 588(8, 9); Bennett v. Potashnick, 214 Mo. App. 507, 257 S.W. 836, 839; 2 C.J.S., Agency, § 23g, page 1050], although the two frequently are confused and the courts usually fail to draw any distinction between them, perhaps because the same state of facts often will support a finding of agency on either theory. E. C. Robinson Lumber Co. v. Lowrey, Mo.App., 276 S.W.2d 636, 642. .

█ Apparent authority of an agent, estopping the principal from denying such authority as against an innocent third person, is that authority which a reasonably prudent man, using diligence and discretion, in view of the principal's conduct naturally would suppose the agent to possess. State ex rel. Massman v. Bland, 355 Mo. 17, 194 S.W.2d 42, 45–46(5); City of Springfield, for Use and Benefit of Horton v. Koch, 228 Mo.App. 511, 72 S.W.2d 191, 194(7), 195(9). "* * * (T)he party who claims reliance (on an agent's apparent authority) must not have closed his eyes to warning or inconsistent circumstances. Authority is not 'apparent' simply because the party claiming has acted upon his conclusions * * * (nor) simply because it looked so to him. It is not a situation where one may read while he runs. It is only where a person of ordinary prudence, conversant with business usages and the nature of the particular business, acting in good faith, and giving heed not only to opposing inferences but also to all restrictions * * * brought to his notice, would reasonably rely, that a case is presented within the operation of the rule." Mechem on Agency (2nd Ed.), Vol. 1, Sec. 726, p. 513.

█ Defendant, who modestly conceded that "I have been around some," is presumed to have been familiar with the custom and usages of the business in which he was engaged. Thudium v. Central

States Savings & Loan 'Ass'n, 224 Mo.App. 649, 31 S.W.2d 220, 223(4). Certainly, an agreement to purchase $6,000 worth of watches with the understanding that payment would be made out of anticipated profits from production and sale of a "shock resistance demonstrator," none of which had been sold, would be a singular, extraordinary and unusual arrangement for any merchant to make with his wholesale supplier; and, on the record before us, defendant had no legal right to place "blind trust" (*if, in fact, he did*) in Bitkower's statements pertaining to an arrangement so patently extraordinary and unusual. J. R. Watkins Co. v. Lankford, 363 Mo. 1046, 256 S.W.2d 788, 790(1); Globe Securities Co. v. Gardner Motor Co., 337 Mo. 177, 85 S.W.2d 561, 568(17); C. I. T. Corporation v. Hume, Mo.App., 48 S.W.2d 154, 157 (10); Pemiscot County Abstract & Investment Co. v. Duncan, Mo.App., 194 S.W. 299(1); N. Friedman & Sons v. Kelly, 126 Mo.App. 279, 102 S.W. 1066, 1068(2).

■ Although an agent is a competent witness to establish his own agency [Barr v. Hawe, Mo.App., 166 S.W.2d 244, 246 (2); Sinclair Refining Co. v. Farmers Bank of Portageville, 230 Mo.App. 1132, 91 S.W.2d 122, 126(4); Mechem on Agency (2nd Ed.), Vol. 1, Sec. 291, p. 211], agency cannot be established by proof of acts, declarations or conduct of the alleged agent, unless same are known to the principal or are so often repeated that knowledge on the part of the principal is implied. Fair Mercantile Co. v. Union-May-Stern Co., 359 Mo. 385, 221 S.W.2d 751, 754(5); Stevens Davis Co. v. Sid's Petroleum Corporation, Mo.App., 157 S.W.2d 246, 249(9). Thus Bitkower's alleged statements to defendant (not shown to have been known to Wyler Watch) that "he was president of the Western Division, and whatever he said went," did not establish Bitkower's authority.

■ In this court-tried case, it is our duty to "review the case upon both the law and the evidence as in suits of an equitable nature." Section 510.310(4);

Scott v. Kempland, Mo., 264 S.W.2d 349, 355(10); Howell v. Reynolds, Mo., 249 S.W.2d 381, 387(13). (All Missouri statutory citations are to RSMo 1949, V.A. M.S.) Although "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses" [Section 510.310(4)], we cannot avoid the responsibility of independent review and consideration. Cross v. Gimlin, Mo., 256 S.W.2d 812(3); Faire v. Burke, 363 Mo. 562, 252 S.W.2d 289, 290(1). Similarly, although "the judgment shall not be set aside unless clearly erroneous" [Section 510.310(4); Cosentino v. Heffelfinger, 360 Mo. 535, 229 S.W.2d 546, 549(1); Truck Leasing Corp. v. Esquire Laundry & Dry Cleaning Co., Mo.App., 252 S.W.2d 108, 109(1)], we are enjoined by statute to "give such judgment as (the trial) court ought to have given, as to the appellate court shall seem agreeable to law." Section 512.160(3); Allen v. Allen, Mo., 270 S.W.2d 33, 34–35(1). "Unless justice requires otherwise the court shall dispose finally of the case on appeal and no new trial shall be ordered as to issues in which no error appears." Section 512.160(3). Although we entertain the highest respect for the perspicacity and ability of the learned trial judge, "the obligation of due deference does not permit us to yield our own firm convictions because another tribunal possessed of an equal sense of justice may have found differently upon the same facts" [Tebbe v. Tebbe, 223 Mo.App. 1106, 21 S.W.2d 915, 918]; and, "if a careful consideration of all the evidence convinces us that a wrong decision has been made, we must not follow the easy way and affirm the judgment." McBee v. Twin City Fire Ins. Co., Mo.App., 238 S.W.2d 685, 688(1). See also Sellers v. Swehla, Mo. App., 253 S.W.2d 847, 853; Needham v. Needham, Mo.App., 299 S.W. 832, 835.

■ From the transcript before us, we cannot find that defendant's expenditures "in the developing, redesigning, patenting and other matters incident to the production of the machine" were made pursuant to any *agreement* that he would be reimbursed therefor by plaintiff, for his testi-

mony and letters plainly indicate to the contrary. And, conceding that Bitkower's representations concerning commercial production and sale of the machine were false, fraudulent and malicious, we still are unable to conclude that Wyler Watch should respond in damages therefor. The only written agreement pertaining to the machine was between defendant and Bitkower personally. Admittedly, neither Alfred Wyler nor. Paul Wyler made any agreement with defendant pertaining to purchase, manufacture or sale of the machine. That Wyler Watch had written defendant that a sales representative would call on him "in order that he may send us a full report in the matter" and subsequently that "they would have someone come and see about it" furnished no reasonable basis for defendant to believe that Bitkower was authorized to enter into an agreement on behalf of Wyler Watch for production and sale of the machine or that payment for $6,000 worth of watches would be made from future sales of the machine. And, that defendant, himself, was *not* satisfied that Bitkower was authorized to enter into any such agreement is demonstrated by the fact that, when in Chicago during November, 1950, defendant *insisted* that Bitkower call Alfred Wyler to "see if it was all right with them."

Furthermore, the gravamen of defendant's complaint is, in the final analysis, *not* that any alleged agreement with Wyler Watch was breached but rather that Bitkower did not deliver to him (defendant) the plates, molds and six machines which defendant believed .to. have been manufactured in Chicago but had never seen, and of the existence of which there was no evidence other than that of Bitkower's alleged statements. For, defendant testified that "*if he will get my machines back I*

*will pay the bill tomorrow*" and again that "*the thing I am wanting is my molds and plates back.*" But, this is not a suit for patent infringement and the patent, itself, affords legal protection against defendant's expressed fear that "I am not going to (leave) those plates and molds up there— they can start tomorrow making the same thing."

▮▮▮▮▮ Having in mind also that the law ordinarily indulges no presumption that agency exists [Kaden v. Moon Motor Car Co., Mo.App., 26 S.W.2d 812, 813–814(3); Renick v. Brooke, Mo.App., 190 S.W. 641, 642; 3 C.J.S., Agency, § 315a, page 252; 2 Am.Jur., Agency, Sec. 442, p. 349] and that, where agency is in issue, the burden of establishing it rests upon the party by whom it is alleged, in this instance upon defendant, and the facts to establish it must be given their reasonable and natural construction [Schneider v. Dubinsky Realty Co., 344 Mo. 654, 127 S.W.2d 691, 694(5); Williams v. Manning Welding & Engineering Co., Mo.App., 215 S.W.2d 319, 322 (1); Dell-Wood Tires v. Riss & Co., Mo. App., 198 S.W.2d 347, 353(4)], we can find no sound basis for any judgment against plaintiff on defendant's counterclaim. We need not and do not consider what cause of action (if any) defendant may have against Bitkower personally. The judgment for plaintiff on its petition, from which no appeal was taken, is affirmed, the judgment against plaintiff on defendant's counterclaim is reversed, and the cause is remanded with directions to set aside the judgment on defendant's counterclaim, enter judgment for plaintiff thereon, and authorize issuance of execution on the judgment for $2,914.55 entered on plaintiff's petition.

McDOWELL, P. J., and RUARK, J., concur.